**W.L. GORE & ASSOCIATES, INC., Plaintiff,**

**v.**

**TOTES INCORPORATED, Defendant.**

**Civ. A. No. 92–39–JLL.**

United States District Court, D. Delaware.

March 19, 1992.

As Amended April 1, 1992.

Robert H. Richards III, Allen M. Terrell, Jr. and Robert W. Whetzel of Richards, Layton & Finger, Wilmington, Del., David H. Pfeffer, Janet Dore, Dickerson M. Downing, Gabriel Kralik of Morgan & Finnegan, New York City, and John S. Campell of W.L. Gore & Associates, Inc., Newark, Del., of counsel, for plaintiff.

Rudolf E. Hutz and Collins J. Seitz, Jr. of Connolly, Bove, Lodge & Hutz, Wilmington, Del., and J. Robert Chambers, Gregory F. Ahrens of Wood, Herron & Evans, Cincinnati, Ohio, of counsel, for defendant.

## OPINION

LATCHUM, Senior District Judge.

The plaintiff, W.L. Gore & Associates, Inc. ("Gore"), seeks a preliminary injunction to prevent Totes Incorporated (" 'totes' ") from making false and misleading descriptions and/or representations of fact in its advertising and from infringing on its trademark.[1] The plaintiff questions whether 'totes' is telling the whole truth about its product in its advertisements and its literature.

To obtain relief, the plaintiff must make a showing of four factors: (1) reasonable probability of success on the merits, (2) irreparable injury absent relief, (3) the possibility of harm to the defendant and other interested parties, and (4) the public interest. *Opticians Ass'n of America v. Inde-*

pendent Opticians of America, 920 F.2d 187, 191–92 (3d Cir.1990) (citing *Bill Blass, Ltd. v. Saz Corp.*, 751 F.2d 152, 154 (3d Cir.1984)); *Sandoz Pharmaceuticals Corp. v. Richardson–Vicks, Inc.*, 735 F.Supp. 597, 600 (D.Del.1989), *aff'd*, 902 F.2d 222 (3d Cir.1990) (citing *Eli Lilly & Co. v. Premo Pharmaceutical Laboratories, Inc.*, 630 F.2d 120, 136 (3d Cir.), *cert. denied*, 449 U.S. 1014, 101 S.Ct. 573, 66 L.Ed.2d 473 (1980)). The defendant argues that the plaintiff cannot make the appropriate showing for a preliminary injunction because its claims are true and, in the alternative, that the plaintiff has not suffered irreparable damage and that the delay in bringing suit undercuts the urgency of this type of relief.

For the reasons set forth below, this Court finds that certain statements contained in the 'totes' advertisements are likely to be shown to be false and misleading and that the plaintiff is likely to succeed on the merits under the Lanham Act. Furthermore, this Court finds irreparable harm to the plaintiff and a need to protect the public from confusion and deception. Therefore, in this Court's discretion, the plaintiff's motion for preliminary injunctive relief will be granted with respect to the false and misleading claims discussed *infra*. An order will be entered in accordance with this opinion.

## I. RELEVANT BACKGROUND

Over the last thirty-five years, Gore expanded its operations from the manufacture of wire and cable to the manufacture of products in many different industries. (Docket Item ["D.I."] 1 ¶¶ 6–7.) Among Gore's most successful products is its patented GORE–TEX fabric which is simultaneously waterproof and breathable, although these are generally contradictory properties, and it is windproof as well. (D.I. 1 ¶ 8; 7 Hoover Decl. ¶¶ 2–3; 14 McElwee Decl. ¶ 3, Ex. 8.) A membrane laminated to the fabric itself ensures that these features are uniform over the entire gar-

---

**1.** Gore alleges that 'totes' use of the phrase "guaranteed to keep you dry" infringes on its registered trademark, "GUARANTEED TO KEEP YOU DRY". However, the infringement

of the mark is not at issue in the current motion for preliminary injunction. (Docket Item ["D.I."] 41 at n. 3.)

ment and the fabric has become the standard by which the performance of other fabrics are judged. (D.I. 6 at 7; 7 Hoover Decl. ¶¶ 2–3; 10 Ex. 5; McElwee Decl. ¶ 3 Ex. 13; 14 Exs. 9, 10, 11, 12.)[2] The GORE–TEX fabric is sold under the trademarked slogan GUARANTEED TO KEEP YOU DRY. (D.I. 1 ¶¶ 14–15, 17; 6 at McElwee Decl. ¶ 7, Exs. 11, 14.)[3]

Defendant 'totes', also a well established company, is a leader in umbrellas and footwear/wearing apparel for inclement weather. (D.I. 27; 36.) The focus of the dispute is the defendant's golf suits, which compete with golf suits manufactured from GORE–TEX fabric, and the advertisements designed to sell the defendant's golf suits. (D.I. 1 ¶ 18; 38 Rastani Decl. ¶ 3.) Both the construction of the defendant's suit and the advertisements have changed over the relevant time period. When 'totes' designed the suits in March of 1985, the golf suits consisted of a single layer of TECH–TEX fabric. Although the fabric supplier changed in January of 1988, 'totes' made no changes to the single layer construction and the fabric remained substantially the same. A liner was added to the back of the pants in May of 1989 and to the sleeves of two styles[4] of golf suits in September of 1991. (D.I. 7 ¶ 9; 11 Martucci Decl. ¶ 5; 41 at 2; 44 at 25–26; 46 Fritz Decl.)

In the initial 1986 advertising, the TECH–TEX fabric was billed as "the Hi-Tech Break–Through in Super–Breatha-

ble/Water Resistant Fabrics," and that it "combine[d] superior air breathability and water-resistance to provide ... the ultimate in comfortable golf rain suit." The advertisements described the 'totes' golf suits as "breathable," "quiet," "soft," "water-resistant," and "durable," and stated that "TECH–TEX keeps water out and allows sweat vapor to pass through, quickly ... easily." (D.I. 27 Exs. 2, 3; 37 Exs. 2, 3; 38 Rastani Decl. ¶¶ 4, 5.) 'totes' compared the breathability between TECH–TEX and GORE–TEX, stating that "seven times more air passes through TECH–TEX than through GORE–TEX ... every second," concluding that "TECH–TEX fabric is seven times more breathable than GORE–TEX fabric." 'totes' continued to make similar claims in the following years. (D.I. 27 Exs. 4, 5; 37 Ex. 4; 38 Rastani Decl. ¶¶ 6, 7.)

In January of 1990[5] the advertisements continued the previous claims but also began stating that: (1) TECH–TEX is "the best way to keep dry, keep cool and keep playing," (2) "rain rolls right off, but air and sweat vapor pass right through," and (3) that the TECH–TEX golf rainsuit was "waterproof." (D.I. 7 Ex. 3; 27 Ex. 5; 37 Exs. 5, 6.) To illustrate its confidence in its product, 'totes' guaranteed[6] the performance of its golf suit. (D.I. 37 Ex. 5.) These claims continue to the present time. (D.I. 27 Ex. 6; 37 Ex. 6; 38 Rastani Decl. ¶ 8.) In September of 1991[7], a new adver-

---

**2.** Garments made from GORE–TEX fabric include such outerwear as golf suits, running suits, jackets, coats, raincoats, ski-wear, hats, gloves, and boots. (D.I. 1 ¶ 8; 14 McElwee Decl. ¶ 4.) This fabric has been distributed worldwide, discussed in the media, and extensively marketed. (D.I. 1 ¶¶ 9–13; 7 Hoover Decl. ¶ 12; 14 McElwee Decl. ¶¶ 5–6, 10, Ex. 13.)

**3.** Gore contends, and 'totes' does not dispute, that this trademarked slogan has achieved substantial goodwill and fame. (D.I. 1 ¶ 16.)

**4.** 'totes' advertises four styles of golf suits: (1) Elite, (2) Clubhouse, (3) Eagle, and (4) Fairway. (D.I. 12 Ex. 15; 27 Ex. 6.) Only the first three styles are at issue here and, of these three, the suits are basically constructed the same. Where differences occur, they will be noted in this opinion.

**5.** This is after the 'totes' suit adopted the dual construction, a fabric outer shell and a liner.

The TECH–TEX jacket consisted of the fabric outer shell and the TECH–TEX pants consisted of the fabric outer shell with a liner in the back.

**6.** The "guarantee" introduced in 1990 refers to a one-year warranty, during which time the customer may return the suit due to defective materials or workmanship. (D.I. 7 Ex. 3; 37 Ex. 5.) The written warranty given to the consumer does not give the impression that he/she can return it if not completely satisfied, notwithstanding the representations of the defendant's marketing manager. (D.I. 38 Rastani Supp. Decl.)

**7.** This Court finds defendant's claim that it did not design and create this advertisement to be incredible and disingenuous. (D.I. 36 n. 4.) Assuming arguendo that the Professional Golf Association created an advertisement which made representations far exceeding those previ-

tisement guaranteed that the 'totes' rainsuit would keep the golfer dry and promised that the fabric was the "best waterproof fabric you can find." (D.I. 7 Ex. 1; 37 Ex. 11; 27 Ex. 7.) According to the advertisement, TECH–TEX is "guaranteed waterproof yet [it] is extremely breathable, allowing seven times more air and sweat vapor to pass through the rainsuit than suits produced from GORE–TEX fabric." (D.I. 7 Ex. 1.) The advertisement asserted that "the 'totes' TECH–TEX rainsuits are ideal for bad weather conditions on the course [because] they are waterproof, windproof, breathable, and quiet." The suit is to keep the golfer "cool, dry and comfortable." (D.I. 7 Ex. 1.)

## II. DISCUSSION

The plaintiff contends that the defendant's current advertisements include statements and comparisons that are false and misleading. In essence, Gore does not believe that 'totes' can truthfully say that a golf suit made of TECH–TEX fabric is truly and uniformly waterproof, breathable, and windproof. (7 Hoover Decl. ¶¶ 6, 9.) Gore claims that each suit is constructed of (1) a breathable, but not waterproof or windproof, outer shell, and (2) a water and wind resistant, but not breathable, liner used in selected parts of the garment. In other words, Gore alleges that the 'totes' golf suits are only partially breathable, waterproof, and windproof but that the

ously made by 'totes', a 'totes' representative approved the advertisement before it was published and 'totes' is therefore responsible for its content. (D.I. 38 Fritz Decl. ¶ 2; 42.)

**8.** Section 43(a) of the Lanham Trademark Act provides that:

Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol or device, or any combination thereof, or any ... false or misleading description of fact, or false or misleading representation of fact, which—

....

(2) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities or geographic origin of his or her or another person's goods, services, or commercial activities,

shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

advertisements have led consumers to believe and to expect that the entire suit is waterproof, windproof, and breathable.

### A. Reasonable Probability Of Success On The Merits

■ "To prevail on a claim of unfair competition under federal law [8], a plaintiff must first prove by a preponderance of the evidence that the claims it challenges are either false or misleading." *Sandoz Pharmaceuticals Corp. v. Richardson–Vicks, Inc.,* 735 F.Supp. at 600; *Toro Co. v. Textron, Inc.,* 499 F.Supp. 241, 251 (D.Del. 1980). If the party challenging the advertising claim under § 43(a) shows actual deception, that the claim is literally false, the court need not consider the actual effect on the buying public. *Upjohn Co. v. Riahom Corp.,* 641 F.Supp. 1209, 1222 (D.Del.1986). When the advertising claim is false, the court may grant relief on its own findings that the advertisements have a "tendency to deceive". *Stiffel Co. v. Westwood Lighting Group,* 658 F.Supp. 1103, 1111 (D.N.J.1987). However, "literal falsity" must be considered within the context in which the message was conveyed. *Id.,* 658 F.Supp. 1103, 1110 (D.N.J.1987); *Plough, Inc. v. Johnson & Johnson Baby Products,* 532 F.Supp. 714, 716–17 (D.Del.1982).

■ If the claims are not so clearly false [9], the claim may be literally true but

15 U.S.C. § 1125(a) (Supp.1991). The plaintiff also claims that the statements violate Delaware's Uniform Deceptive Trade Practices Act, Delaware's Trademark Act, and that the statements constitute unfair competition and trademark infringement under common law. Because Gore is entitled to a preliminary injunction under the Lanham Act, this Court need not consider the state and common law claims.

**9.** Section 43(a) requires that the merchant tell the whole truth. The law embraces "innuendo, indirect intimations, and ambiguous suggestions evidenced by the consuming public's misapprehension of the hard facts underlying an advertisement." *Upjohn Co. v. Riahom Corp.,* 641 F.Supp. at 1224 (quoting *Vidal Sassoon, Inc. v. Bristol–Myers Co.,* 661 F.2d 272, 277 (2d Cir. 1981)); *U.S. Healthcare, Inc. v. Blue Cross of Greater Philadelphia,* 898 F.2d 914, 921 (3d Cir. 1990), *cert. denied,* — U.S. ——, 111 S.Ct. 58, 112 L.Ed.2d 33 (1990) ("partially incorrect or untrue statements resulting from a failure to

misleading, then the court must consider the effect on the buying public. *Sandoz Pharmaceuticals v. Richardson–Vicks, Inc.* 735 F.Supp. at 600. The party challenging the claims must persuade the Court, either through market research, consumer studies, or other evidence, that the persons receiving the message will be left with a false impression about the product and that the deceptive statement is "material, in that it is likely to influence the purchasing decision." *Toro Co. v. Textron, Inc.*, 499 F.Supp. at 251; *Stiffel Co. v. Westwood Lighting Group*, 658 F.Supp. at 1111. The Court must determine whether the evidence shows that the advertising claim has a tendency to deceive. *Sandoz Pharmaceuticals Corp. v. Richardson–Vicks, Inc.*, 735 F.Supp. at 600; *Toro Co. v. Textron, Inc.*, 499 F.Supp. at 251 (no requirement that purchasers actually be deceived).

### 1. Waterproof

■ 'totes' claims that the TECH–TEX fabric is waterproof and, from this claim, promises that the golf rainsuit is waterproof. (D.I. 7 Ex. 1; 27 Ex. 6; 37 Ex. 5.) In connection with this claim, 'totes' promises that the fabric/suit will keep the golfer dry and comfortable. (D.I. 7 Ex. 1; 27 Ex. 6; 37 Ex. 5.) In the strongest advertisement, 'totes' guarantees that the golfsuit will keep the golfer dry and describes it as the "best waterproof fabric you can find." This Court is convinced that the TECH–TEX fabric is not waterproof [10] and that the claim of "waterproofness" is false on its face.

First, independent tests indicate that the lined portions of the suit are waterproof but that the outside shell alone is not. (D.I. 10 Hepler Decl.; 11 Marucci Decl.; 38 Ex. C.) Also, the fabric had not been substantially changed and, before a liner was added to the backside of the golf suit, 'totes' had only claimed that the suit was water resistant. (D.I. 37 Exs. 2, 4.) In the absence of an explanation for the change in terminology by 'totes', this Court agrees with the plaintiff that it is likely that 'totes' added the liner because the fabric alone was not waterproof. (D.I. 44 at 14.) Because 'totes' did not add a liner to the entire suit (D.I. 7 Hoover Decl. ¶ 9; 10 Hepler Decl. ¶ 3; 11 Martucci Decl. ¶ 5; 35 ¶ 25), it is reasonable to conclude that the areas without the liner can still only be claimed to be water resistant.[11] Therefore, the suit is only "waterproof" in selected places. (D.I. 10 Hepler Decl. ¶ 6; 11 Martucci Decl. ¶ 6.) [12]

Instead, the defendant denies that it has made any claim that "every inch" of the suit is uniformly waterproof. (D.I. 35 at ¶ 26.) But advertisements clearly represent that the fabric itself was waterproof and the fabric referred to covers the entire suit. (D.I. 7 Hoover Decl. Ex. 3; 46.) Also in 1990, the catalog reads "Finally, a waterproof golf rainsuit that not only keeps you dry ..." and a hangtag that claims that the "golf suit is waterproof even after washing...." (D.I. 7 Ex. 3; 12 Ex. 15.) Because these advertisements did not use qualifying language or disclaimers and re-

---

disclose a material fact" are actionable under § 43(a)); *Stiffel Co. v. Westwood,* 658 F.Supp. at 1115 ("misdescription of specific or absolute characteristics of a product are actionable"); *Johnson & Johnson v. Quality Pure Mfg., Inc.,* 484 F.Supp. 975, 983 (D.N.J.1979) (absence of credible substantiation for advertising claim forms basis for an injunction).

**10.** The defendant offers a statement from the manager of its research and development department and from an independent expert stating that the suit is waterproof based upon a "rain test," which measures the resistance to penetration of water by impact. (D.I. 38 Pacheco Ex. A, Uffindell ¶ 2.) However, 'totes' submitted no data from its in-house testing and as

noted by its counsel, "tests can be performed in a manner to show almost anything." (D.I. 27 at 11.) The defendant's expert report also indicated that the test was a "resistance test" and that the outer fabric was not "waterproof" even under this test. (D.I. 38 Ex. C; 42 Ex. A.)

**11.** A water resistant suit will likely permit rain to roll off, making this claim permissible.

**12.** Gore contends and 'totes' admits that only some of the seams of the TECH–TEX suit are covered with seam sealing tape. (D.I. 1 ¶ 27; 7 ¶ 9; 35 ¶ 27; 42 Exs. A, D.) The extent to which sealing tape is necessary to waterproofing is unnecessary to this Court's decision so the issue is not decided.

ferred to the suit in its entirety, this Court finds that 'totes' inferred that every inch of the entire suit was uniformly waterproof and this is the claim that must be analyzed.

'Totes' claims, and Gore admits, that there is not a commonly accepted industry definition of "waterproofness" from which to judge whether its claims are true or false. (D.I. 10 Ex. 5; 35 ¶ 26; 37 Exs. 14, 15; 38 Pacheco Decl.; 44 at 37.) From the lack of an industry standard, 'totes' argues that "waterproof" means different things to different people. (D.I. 36.) This Court is convinced that technical industry standards are often irrelevant to consumer expectations and, at the very least, golfing consumers will expect that they will not get wet—especially when the waterproofness claim is coupled with terms like "dry" or "guarantee" or "total." (D.I. 7 Ex. 3.) The definitional distinctions between water resistant and waterproof, found in an ordinary English language dictionary[13], are usually known by the general public. The defendant's use of the term "waterproof" as a representation, one with an accepted common sense definition as to quality, when its product does not conform to the generally accepted definition is an unfair and deceptive practice. *See* G. ROSDEN & P. ROSDEN, THE LAW OF ADVERTISING, § 26.01[87] (1991); *In the Matter of Wilmington Chemical Corp., et al.*, 69 F.T.C. 828 (1966). In the eyes of the general consumer, a waterproof golf suit will protect them from rain and ensure that they will not get wet. The lack of an "industry standard" makes the claim no less false.

■ Not only is the 'totes' product not waterproof, it certainly is not the "best waterproof" suit available or the "best way to keep dry." This Court concludes that 'totes' had absolutely no grounds for believing that this claim was true and that existing evidence indicated that it was likely false. While the defendant had evidence that the golf suit was water resistant, (D.I. 38 Pacheco and Uffindell Decls.), the defendant offers no evidence of comparison testing, either before or after the claim was made, and no evidence for the basis of this claim. (D.I. 38 Pacheco Decl. ¶ 8, Uffindell Decl. ¶ 2.) The plaintiff's independent tests[14] show that the TECH–TEX shell provides only one-eighth the protection of GORE–TEX and the TECH–TEX shell coupled with the lining is less waterproof than GORE–TEX in two of the three suits. (D.I. 10 Hepler Decl. ¶ 6; 11 Martucci Decl. ¶ 6.) In fact, by the defendant's own admission, the TECH–TEX fabric falls within the midrange of an industry ranking. (D.I. 36 at 30.) Here, this is not a general claim of superiority or mere puffery, it is a claim juxtaposed with a comparison to GORE–TEX and, therefore, the claim is literally false.

■ The defendant maintains that the message was conveyed in the context of golfing activities and that its golf suits are waterproof with respect to its intended application as a golf suit. In other words, whether the claim is literally true or false "depends on the environment in which the article is intended to be used." (D.I. 36; 37 Pacheco Decl.; 44 at 30.) As evidence, 'totes' points to the fact that the fabric and liner are waterproof under storm conditions and that the golfer's backside is protected when he/she is sitting in a golf cart. (D.I. 36; 37 Pancheco Decl. ¶¶ 4, 8, 9.) However, the game of golf encompasses more than sitting in a golf cart. None of the golf suits have a liner in the front of

---

**13.** "Waterproof" means impervious to water, not permitting penetration or passage, and is clearly a stronger claim than "water repellent" which means resistant but not impervious to penetration by water or "water resistant" which means resistant to but not wholly proof against the action or entry of water. (D.I. 42 Ex. 25.) A glossary in a fabric handbook defines "waterproof" as "[t]he ability of a fabric to withstand penetration by water." (D.I. 10 Ex. 5; 42 Ex. 24.)

**14.** The experts disagree as to the correct test for measuring waterproofness. (D.I. 11 Martucci Decl.; 36; 38; 37 Pacheco Decl.; 41; 42 Ex. A.) The plaintiff's expert used a "hydrostatic test," which considers the application of pressure, rather than the "rain test" conducted by the defendant. Resolution of this battle of the experts is unnecessary to this Court's opinion, as discussed *infra,* and therefore no finding is made.

the pants and a golfer will get wet when he/she kneels.[15] It appears to this Court that kneeling, although it may not happen often, may be part of the golfing experience. It is foreseeable that one could kneel to line up or mark a putt, to replace a divot, or to return to one's feet after accidently slipping on wet grass. The suits with a liner in the sleeves [16] do not "waterproof" the golfer's back and shoulders. This Court concludes that the claim of waterproofness is clearly false, even when limiting the claim within the context of golfing activities.

■ Finally, 'totes' presents testimonials from happy customers and cites statistics that TECH–TEX has a 99.5% satisfaction rate with customers. (D.I. 27 Rastani Decl. ¶ 10; 36 at 23; 38 Bohrer Decl., Parthemer Decl., Rastani Decl., Rastani Supp. Decl.; 39.) 'totes' argues that the consuming public is the best judge of its claims. But a false claim is still a false claim, even if customers do not think the false claim is important enough to complain about it. Section 43(a) also recognizes that competitors can be injured by false advertising and it protects competitors from damage caused by such claims. *Thorn v. Reliance Van Co.*, 736 F.2d 929, 931 (3d Cir.1984). The defendant's argument that Gore and 'totes' are not competitors is spurious and merits no discussion. (D.I. 36 at 21; 41 at 19–20.)

This Court concludes that the defendant's assertions that the 'totes' golf suits are waterproof in their entirety are literally false because the suits are waterproof only in limited areas. The claims are only partially correct and, therefore, they are literally false. *See Tambrands, Inc. v. Warner–Lambert Co.*, 673 F.Supp. 1190, 1193–

94 (S.D.N.Y.1987) (pregnancy test promise that one will know that they are pregnant in 10 minutes is literally false when positive results are generally known in 10 minutes but negative results cannot be confirmed until 30 minutes have elapsed). The TECH–TEX suit is not waterproof and it is not the "best waterproof" suit available. To a golfer shopping for a rainsuit so that he/she can continue to play in inclement weather, 'totes' has not told the whole truth and, given the use of the golf suits, this Court finds a tendency to deceive. The plaintiff is likely to succeed on the merits on this issue.

### 2. Breathability/Windproofness [17]

■ The 'totes' advertisements claim that: (1) the TECH–TEX fabric is "breathable," "sweat vapors pass through ... quickly," (2) "the TECH–TEX fabric is seven times more breathable than GORE–TEX fabric," (3) the TECH–TEX suits are "extremely breathable, allowing seven times more air and sweat vapor to pass through the rainsuit than suits produced from GORE–TEX fabric," (4) the TECH–TEX fabric "allows seven times more air to your skin than the next leading fabric," and (5) the TECH–TEX rain suits are windproof. (D.I. 7 Ex. 1; 27 Ex. 6; 37 Exs. 4, 5.)

As to the first claim, this Court finds it to be neither false nor misleading. Both parties agree that "breathability" is a relative term, a word meaning different things to different people, and this Court notes the absence of a commonly accepted definition of quality or a minimum industry standard. (D.I. 14 Ex. 11; 37 Ex. 14, 15 at 11.) Breathability and comfort depend on individual perception and such a subjective claim cannot be literally true or false. Moreover, the defendant has stated that

---

15. The plaintiff demonstrated this fact at the February 19, 1992 hearing. (D.I. 44.) A product specialist from the Golfwear Division at Gore, wearing a pair of TECH–TEX pants over his regular pants, knelt on a dampened napkin for a couple seconds. He then removed the TECH–TEX pants and found a waterspot on the knee of his regular pants. (D.I. 44 at 13–14.) Counsel for 'totes' did not challenge or object to this demonstration.

16. While the Clubhouse and Eagle styles have a liner in the sleeves, the Elite style does not. (D.I. 17.)

17. "Breathability" is the ability of a fabric to allow moisture vapor (sweat vapor) to pass through its fibers and "Air permeability" is the ability of a fabric to allow air to pass through its fibers (windproofness). (D.I. 7 Hoover Decl.; 10 ¶ 3, Ex. 5; 42 Ex. 24.) Breathability and windproofness are contrary properties. (D.I. 7 Hoover Decl.)

the TECH–TEX fabric alone is breathable, a statement based upon its own testing, and for the last six years Gore has agreed. (D.I. 7 Hoover Decl.; 10 Hepler Decl.; 36 Ex. 2, 4; 38 Uffindell Decl. ¶ 3; 44 at 4.) The mere fact that a liner was added to certain parts of the suit does not preclude 'totes' from making claims as to the fabric alone. Here, the wording clearly limits the scope of the claim to the fabric itself. Therefore, the claims addressing the breathability characteristics of the fabric alone are permissible.

■ Likewise, the comparative claim is not false or misleading. The actual TECH–TEX fabric has not substantially changed since 1986 and counsel for Gore indicated that the earlier 'totes' claims had been tested and found to be sufficiently substantiated. (D.I. 44 at 4.) Given the limited areas where the lining affects "breathability," and the likelihood that both sides will have equally persuasive expert testimony, this Court cannot conclude that the plaintiffs have a reasonable probability of success on the merits of this particular claim. General comparative claims, claims that the fabric is "extremely breathable" or possesses "superior breathability" are permissible.

■ The third claim, however, appears to be false and it has a tendency to deceive for two different reasons. First, 'totes' appears to be warranting that the *rainsuits* themselves are seven times more breathable than suits made of GORE–TEX, rather than claiming that the fabric alone is more breathable. Because the numerical comparison gives the impression that the claim is based upon independent testing, this Court concludes that this is not a claim of general superiority or mere puffing. As discussed *supra*, the 'totes' golf suit consists of more than an outer fabric shell. While any past representation that the suit itself was more breathable may have been accurate, the accuracy of this representation may no longer be accurate given the new dual construction of the suit. The defendant offers no comparative testing to ensure that the previously made claim continues to be accurate with the current dual construction. (D.I. 6 at Hepler Decl. ¶ 3,

Martucci Decl. ¶ 2, Ex. 6, Venench Decl. ¶ 2, Ex. 7; 13; Hoover Decl.; 41 at 17; 44 at 11.)

Gore offers test results from an independent testing lab that the outside fabric is less permeable to water vapor than the GORE–TEX two-layer laminate and that the TECH–TEX shell/lining combination is not breathable in any meaningful degree. (D.I. 10 Hepler Decl. ¶ 6; 13 Venech Decl. ¶ 5.) The defendant's own expert opined that the suit designed with both the outer shell and the lining is not breathable, (D.I. 38 Pacheco ¶ 11, Exs. D, E), making the TECH–TEX suit "breathable" only in selected parts, not uniformly over the entire suit. The lining, which precludes breathability, is especially crucial under the arms where breathability is likely to be important. (10 Hepler Decl.; 13 Venech Decl.)

■ Again, the defendant contends that its TECH–TEX golf suit is breathable, albeit to different degrees in different portions of the suits, and that it never claimed that every inch of the suit is uniformly breathable. (D.I. 35 ¶ 26.) This Court again rejects this argument both for the reasons previously discussed and because the GORE–TEX suit, in its entirety, is the bases for the comparative claims at issue. Given this evidence, this Court finds that continuing to make breathability comparisons when the construction of the suit has materially changed, without new comparison testing, constitutes an unfair practice. This Court finds that the defendant did not have good faith grounds to believe that its claims were true and, to the contrary, the unrebutted subsequent studies indicate that the claims are literally false.

■ Second, Gore claims, and 'totes' does not dispute, the absence of a recognized test to simultaneously examine air and sweat vapor properties and that air and sweat vapor are separate and distinct properties. (D.I. 7 Hoover Decl. ¶ 5, Ex. 2; 10 Hepler; ¶ 3.) Air penetration will be relevant to a windproofness claim while sweat vapor will be relevant to a breathability claim. (D.I. 10 Ex. 5.) While general claims of air penetration, if not contradicted by a claim of windproofness, and breath-

ability can be truthfully asserted, the advertised claim of "seven times more air and sweat vapor" indicates that 'totes' ran independent tests before making this claim. Once more, this Court notes the absence of any such evidence. Given the separate and distinct nature of these properties and the absence of tests evaluating the simultaneous transmission of both air and sweat vapor, this claim must be deemed to be scientifically false. As activewear, breathability is likely to be a consideration when selecting a golf suit and this Court finds a tendency to deceive.

 The defendant's fourth and fifth claims appear to be contradictory and, therefore, one claim must be false. The defendant states that the TECH–TEX fabric "allows seven times more air to your skin," but if air can pass through the suit, then the suit cannot be windproof. (D.I. 7 Hoover Decl. ¶ 6; 11 Martucci Decl. ¶ 6; 42 Ex. D; 10 Hepler Decl.; 44 at 15–16.) Intuitively, this statement makes sense and it is unrebutted by the defendant. The record does not reflect that these claims were paired together, or that any assertion of windproofness was ever made, before September 1991. (D.I. 41.) Again, the defendant only claims that its TECH–TEX golf suit as a whole is windproof, albeit to different degrees in different portions of the suits, not that every inch is windproof. (D.I. 35 ¶ 26.) The defendant's evidence in support indicates that the fabric itself permits air to permeate the suit, a claim which is accurate when limited to the fabric itself, but that the combined shell and lining do not allow any measurable amount of air to pass through. (D.I. 10 ¶ 6; 38 Pacheco Decl. ¶ 10.)

But the advertisement states that the " 'totes' TECH–TEX rainsuits are ideal for bad weather conditions on the course [because] [t]hey are . . . windproof." (D.I. 7 Ex. 1.) This Court concludes that the message conveyed is that the entire suit is windproof. Not only is the suit itself not windproof, the liner only covers the backside of the pants and, in two of the styles, the sleeves. (D.I. 7 Hoover Decl.; 35 ¶ 25; 38 Ex.D.) In spite of telling the consumer

that the suit is windproof, the reality is that only the golfer's backside and arms are protected from the wind and that this protection is also only provided if the golfer purchases certain styles of the suit. This Court concludes that any assertions that the TECH–TEX fabric simultaneously permits air to enter but keeps the wind out is scientifically false and that the suit is only partially windproof in limited areas. This Court concludes that these claims are literally false and there is a reasonable probability the plaintiff will succeed on the merits with respect to the fifth claim. This falsity has a tendency to deceive a golfer shopping for a suit to protect him/her from the wind.

### B. Irreparable Injury To W.L. Gore & Associates

 To prove irreparable injury under § 43(a), Gore need only provide "a reasonable basis for the belief that . . . [it] is likely to be damaged as a result of the false advertising." Upjohn Co. v. Riahom Corp., 641 F.Supp. at 1224 (quoting Johnson & Johnson v. Carter–Wallace, Inc., 631 F.2d 186, 190 (2d Cir.1980)). Irreparable injury does not require diversion of actual sales and it can include the loss of control of reputation, loss of trade, and loss of goodwill. Id.; Opticians Ass'n of America v. Independent Opticians of America, 920 F.2d at 195 (quoting 2 J. MCCARTHY, TRADEMARKS AND UNFAIR COMPETITION, § 30:18 (2d ed. 1984)).

 Gore has shown irreparable harm under § 43(a). Gore contends, and this Court agrees, that it was a pioneer and innovator in the outerwear fabric market. Gore contends, and this Court agrees, that it has spent substantial resources in building its reputation as a leader in the field and a reputation for turning out a quality product. Gore contends, and this Court agrees, that Gore's higher price is directly related to the technological characteristics of the product. Here, the 'totes' product is advertised as having the same technological characteristics, at a much lower price, when it is likely that the product does not

possess such characteristics and the advertisements go further to claim that the 'totes' product is superior to GORE–TEX. (D.I. 7 Exs. 1, 3; 15 McElwee Supp.Decl. ¶ 5; 30 McElwee Supp.Decl. ¶ 5.) There is a reasonable basis to believe that Gore is likely to be damaged. This false advertising disparages Gore's product and tarnishes Gore's reputation. Repeated claims of competitive superiority made to the same market of consumers will eventually lead to lost sales [18] and deprive Gore of a legitimate competitive advantage. While the scope and amount of this damage may be difficult to measure, it is sufficient for the grant of injunctive relief under § 43(a).

■ 'totes' claims that because there is no causal link between the advertisements and the irreparable harm, injunctive relief is inappropriate. However, this Court finds the advertising claims to be literally false and, therefore, it can make its own findings as to whether these claims have a "tendency to deceive." More concrete evidence is only needed if the claim is literally true but misleading. This Court is convinced that false waterproof and windproof claims made to golfers purchasing a golf suit to protect them from the wind and rain have a tendency to deceive. This Court is also convinced that false breathability claims made to purchasers of sportswear have a tendency to deceive. This Court finds that the deception will lead to a loss of control of reputation, a loss of trade, and a loss of goodwill. Moreover, this Court is convinced that a misleading comparison to a specific competing product necessarily diminishes the product value in the minds of the consumer. See McNeil–P.P.C., Inc. v. Bristol–Myers Squibb Co., 755 F.Supp. 1206, 1211 (S.D.N.Y.1990), aff'd, 938 F.2d 1544 (2d Cir.1991); McNeilab, Inc. v. American Home Products Corp., 848 F.2d 34, 38 (2d Cir.1988); Stiffel Co. v. Westwood Lighting Group, 658 F.Supp. at 1115–1116. Therefore, given this Court's findings, there is a reasonable basis for concluding that Gore will be irreparably injured as a result of the defendant's advertisements.

'totes' argues that GORE cannot be irreparably harmed by 'totes' when GORE permits other manufacturers to make the same or similar claims. (D.I. 27; 37 Exs. 16–19.) However, the record does not adequately show the truth or falsity of these claims and Gore advertisements try to combat these claims, referring to the competing products as "so-called waterproof." Gore has taken great pains to minimize the effects of its competitors' claims and, thus, these battles are being fought in the marketplace where they belong. (D.I. 4 Ex. 10; 37 Exs. 14, 15.) Additionally, the record does not reflect that any of the other competitors are leaders in the rainwear market or directly compare their products in the manner that 'totes' has, undercutting GORE's efforts to address the erroneous claims. (D.I. 37 Ex. 16; 42.) By specifically referring to GORE–TEX, 'totes' has taken the battle out of the marketplace and triggered litigation.

As a related argument, 'totes' argues that if GORE–TEX truly is the standard by which others in the marketplace are judged, it is unlikely that the public will be misled. (D.I. 36 at 23.) If GORE–TEX is so superior and well marketed, 'totes' claims that the customers will know about the superior performance and move up to the more expensive model if dissatisfied with the TECH–TEX suit. (D.I. 36.) This Court notes three problems with this logic. First, this argument requires that the consumer make two purchases instead of one, possibly getting a refund for the 'totes' suit but only after being inconvenienced. Second, the "more expensive, superior" model is belittled in the 'totes' advertisements, apparently on the bases of scientific testing. This Court fails to understand, and 'totes' fails to explain, why consumers would try the GORE–TEX product if they were dissatisfied with TECH–TEX when they are lead to believe that TECH–TEX is a superior, or at least equivalent, product.

18. Not only may the cheaper price encourage the consumer to purchase the 'totes' product, thinking it is the equivalent of GORE–TEX, but consumers dissatisfied with 'totes' may not bother to purchase Gore on assumption that it too does not work.

Third, this Court rejects the defendant's argument that competitors making baseless and misleading claims should be protected by the reputation of their target, a reputation created by the investment of the target's resources in making its products known and respected in the marketplace.

## C. Balance Of The Equities

■ The preliminary injunction to issue will not prohibit 'totes' from selling its products or truthfully advertising those products. The order will require that "the product be marketed in a forthright manner in the future." *Upjohn Co. v. Riahom Corp.*, 641 F.Supp. at 1225. This Court will not require the destruction of the advertisements, but will require the recall of the offensive advertisements in the marketplace and the setting aside of such advertisements until there is a final resolution on the merits. Until a decision on the merits, the older, accurate advertisements that are currently still in use may be used. (D.I. 41; 42 Hoover Supp.Decl. ¶ 13; 44 at 23.) Should 'totes' ultimately succeed on the merits, they can reintroduce the recalled material. Thus, this Court finds no undue prejudice to 'totes' as a result of granting injunctive relief.

'totes' claims that it will be expensive to recall the current advertising. (D.I. 36 at 41; 38 Rastani Supp.Decl. ¶¶ 6–9.) However, the defendant offered no factual support for many of the representations made to the public and it initially requested additional time to obtain experts to support these claims without explaining why the engineers and experts on staff would not suffice. (D.I. 27; 38 Uffindell Decl. ¶ 2.) In fact, a good bit of the data presented to this Court is from 'totes' marketing department, rather than its research and development department, and the defendant's counsel conceded at argument that some of the statements in the most current advertisement should not have been made. (D.I.

44 at 31.) This Court concludes that these claims were carelessly or irresponsibly made and that any "prejudice" which accrues can be considered to be self-inflicted. The defendant appears to operate under the belief that falsity is expected in the marketplace and that is just how the advertising industry works. (D.I. 44 at 29.) However, this Court disagrees and, by enacting § 43(a), the Congress disagrees as well. This Court finds that the factual evidence to support the claims should have been in the defendant's control *before* the representations were made to the public, not after a competitor complains that it has been injured.

■ 'totes' urges a denial of injunctive relief under the doctrine of laches.[19] The defendant contends that the advertising complained of has been used for over six years and that the delay in objecting undercuts the urgency necessary for granting injunctive relief. While this Court agrees an injunction of the general claims of breathability and the general comparative breathability claims would be inequitable, the Court finds that the other claims are newly discovered and that injunctive relief is appropriate. Also, as discussed *supra*, the only prejudice accrues because of the defendant's behavior, not the delay in bringing the action.

The defendant introduced the dual construction in mid–1989, the "waterproof" claim on a hangtag in January of 1990, and both the windproof claim and the air/sweat vapor breathability claim in late 1991. With respect to the claims made in September 1991, four months is not an inexcusable delay due to the fact that Gore tested the product and tried to negotiate a resolution without litigation. (D.I. 41 at 4; 29 Hoover Supp.Decl.; 10 Hepler Decl.; 11 Martucci Decl.; 13 Venech Decl.) Gore should not be penalized for its investigation into these advertising claims before seeking judicial intervention.

19. A laches defense consists of two essential elements: (1) inexcusable delay in instituting suit, and (2) prejudice resulting to the defendant from such delay. *University of Pittsburgh v. Champion Products, Inc.*, 686 F.2d 1040, 1044 (3d Cir.), *cert. denied*, 459 U.S. 1087, 103 S.Ct. 571, 74 L.Ed.2d 933 (1982). An inexcusable delay that is not so unreasonable so as to constitute abandonment, may bar a claim for an accounting for past infringement but it will not necessarily bar a claim for prospective relief. *Id.* at 1044–45.

■ With respect to the other claims, accurate for a single layer suit but false with a dual layer construction, this Court does not find the two and one-half year delay to be inexcusable. As late as April 1991, the older single construction suits and the accurate advertisements were still in the marketplace. (D.I. 42 Ex. B ¶ 9; 44 at 5–6.) The dates used in this opinion indicate when 'totes' introduced the design or the advertisement, it does not necessarily mean infiltration of the marketplace. (D.I. 41; 29 Hoover Supp.Decl.; 42.) This Court finds that the defendant's claims slowly inched up over the last two and one-half years without giving the plaintiff's inquiry notice that changes were being made and the defendant does not offer any evidence that Gore had actual notice of the claims.[20] This Court does not find deliberate delay, bad faith, or improper motive on Gore's part nor does it find any lack of diligence in tracking advertising claims by competitors. The delay is not so unreasonable so as to bar a claim for prospective relief.

■ Finally, 'totes' argues that, because of the conduct of GORE and its counsel, they do not come to this Court with clean hands, making the grant of injunctive relief inequitable. (D.I. 27.) This Court finds no impermissible conduct and finds this argument to be completely without merit. The Court finds no impropriety in contacting competitors for promotional brochures that are readily given to the public and are already in the public domain. The Court finds only diligence, not impropriety, in purchasing and testing competing products without the competitor's consent. GORE's counsel sent a letter to 'totes' expressing concern as to the accuracy of its claims, indicating that irreparable damage would result in the continued use of such claims, asking for assurances that the perceived false claims would not continue, highlighting the urgency behind the request, and threatening further action if the requested assurances were not forthcoming. (D.I. 27 Exs. 7, 9; 37 Exs. 7, 9.) This Court is not aware, and 'totes' offers no authority, of any duty imposed on GORE to specifically state that it will pursue its claims in court or that it is preparing a lawsuit.

GORE's complaint, its argument and its evidence constituted a "well thought out and carefully crafted plan of attack," (D.I. 27), but it is this Court's opinion that all parties should exercise such thought and diligence before approaching the Court. *See* Fed.R.Civ.P. 11. Perhaps fewer lawsuits would occur if attorneys would follow this practice. The Court finds no deliberate attempt to manipulate the judicial system, designed to generate publicity on the first day of the PGA show for improper commercial benefit. This Court's refusal to grant a temporary restraining order at that time cures any unfairness that might have existed when the motion for injunctive relief was first filed.

### D. *The Public Interest*

■ The public has a right not to be deceived or confused. *Opticians Ass'n of America v. Independent Opticians of America*, 920 F.2d at 197 (quoting 2 J. MCCARTHY, TRADEMARKS AND UNFAIR COMPETITION § 30:21 (2d ed. 1984)); *Upjohn Co. v. Riahom Corp.*, 641 F.Supp. at 1225 ("customer confusion is by its very nature against the public interest"). The public has a right to information that will allow them to assess the quality of a product and to accurately price the product in accordance with their priorities and desires. False advertising deprives the consumer of this information and deceives them into thinking that they are buying a less expensive equivalent, a bargain on a quality product. The public

**20.** The defendant does contend that the advertisements were available at the annual trade shows in 1990 and 1991 and that both parties attended these trade shows. However, the record reflects an animosity between the competitors and 'totes' refusal to amicably exchange promotional brochures. (D.I. 42 Ex. B ¶ 11.) It also appears that the dual construction was not readily apparent and that catching the inaccuracies due to the change in construction required great scrutiny. In absence of precedent to the contrary, this Court refuses to find that Gore's diligence was not sufficient. (D.I. 41 at 2; 42 Hoover Supp.Decl.; 44 at 4.)

also has an interest in commercial competition and the resulting technological innovation and customer service.

First, the public has an interest in protecting business goodwill. Second, there is a public interest in fostering open and fair competition. The former allows consumers to garner a degree of knowledge about products in the market and fosters a sense that they "know what they are getting" when they buy a given product. Indeed, the Seventh Circuit has indicated that the likelihood of confusion by the public as to whether it is receiving the desired product is an important public interest consideration. The latter is obviously a central feature of our economic system.

*Tootsie Roll Industries, Inc. v. Sathers, Inc.*, 666 F.Supp. 655, 661 (D.Del.1987) (citation omitted).

Here, the public is given the unmistakable impression that the entire TECH–TEX garment is waterproof and windproof. The public is being told that the TECH–TEX golf suit is seven times more breathable than Gore's. Given that the suit will be purchased and worn in inclement weather by individuals actively engaged in the sport of golf, these claims definitely have a tendency to deceive. If 'totes' is unable to deliver what is promised, the public interest requires that it should not be permitted to advertise that it can.

## III. CONCLUSION

The Court concludes that 'totes' has exceeded the boundaries of fair play and has violated federal law by making false and misleading claims. Effective upon giving bond, the defendant will be enjoined from making the following advertising claims, or similar claims to the same effect: (1) TECH–TEX is the best waterproof fabric you can find; (2) the TECH–TEX fabric or rainsuit is waterproof, guaranteed waterproof, or total water repellent; (3) TECH–TEX allows seven times more air and sweat vapor to pass through the rainsuit than suits produced from GORE–TEX fabric; (4) TECH–TEX suits are windproof.

Plaintiff will be required to give bond without surety in the amount of $100,-000.00 as required by Rule 65, Fed.R.Civ.P.

## ORDER

Pursuant to Fed.R.Civ.P. 65, this Court has considered the record and arguments of the parties supporting and opposing a preliminary injunction, and for the reasons stated in the opinion entered in this case this date, it is hereby

ORDERED that:

1. Defendant Totes Incorporated, its officers, directors, principals, agents, servants, affiliates, employees, attorneys, representatives, successors and assigns, and all those in privity or acting in concert or participation with defendant, and each and all of them, are until further order of this Court:

(a) PRELIMINARILY ENJOINED from directly or indirectly:

(i) stating, suggesting, communicating, or attempting to communicate to the trade or public, in any manner, including, but not limited to, through advertisements, through displays and presentations at trade shows, through telephone, television, radio, print or sales promotion, through displays, through labels or tags, through point-of-sale product information and merchandising including counter signs, pamphlets and posters, through brochures or in any form, in exact words or in substance that:

(1) TECH–TEX is the best waterproof fabric one can find;

(2) TECH–TEX fabric is waterproof, or total water repellent;

(3) TECH–TEX fabric allows seven times more air and sweat vapor to pass through the rainsuit than suits produced from GORE–TEX fabric;

(4) Golf suits made of TECH–TEX fabric are windproof;

(ii) manufacturing, producing, distributing, using, circulating, selling, offering for sale, advertising, promoting or displaying signs, point-of-purchase displays, advertisements, brochures, flyers, video tapes, audio tapes, hang tags, labels, and other materials containing or conveying the product

claims set forth in paragraph (i)(1)–(4) above or variations thereof;

(iii) making any false or misleading statement, representation or description whatsoever and/or making any false or misleading comparison with, reference to, or representation or description about W.L. Gore & Associates, Inc. ("Gore") or its GORE–TEX products which is likely to deceive or which misrepresents the nature, characteristics, or qualities of Gore's goods or commercial activities or of defendant's goods or commercial activities;

(iv) engaging in any other activity constituting unfair competition with Gore, or causing injury to Gore's reputation or goodwill or the reputation or goodwill associated with Gore's GORE–TEX products; and

(v) assisting, aiding or abetting any other person or business entity in engaging in or performing any of the activities referred to in subparagraphs (i) through (v) above; and further

(b) Defendant is required to cancel or withdraw any and all advertisements, promotions, brochures, tags and other materials which have been placed, circulated, or contracted for and which convey or contain the product claims set forth in paragraphs (a)(i)(1)–(4) above; and further

(c) Defendant is required to remove from all its TECH–TEX or other garments all tags, labels and other materials which convey or contain the product claims set forth in paragraphs (a)(i)(1)–(4) above.

2. In order for this preliminary injunction to become effective, plaintiff Gore shall post a bond in the amount of $100,000.00 without surety as security for the payment of such costs and damages as may be incurred or suffered by defendant who may be found to have been wrongfully enjoined.

### ORDER AMENDING ORDER DATED MARCH 19, 1992

The Court having considered (a) defendant's motion for clarification and reconsideration and for an emergency stay of the order pending clarification or reconsideration (Docket Item ["D.I."] 51) and (b) plaintiff's cross-motion to conform order to opinion (D.I. 52), it is hereby

ORDERED that

1. Paragraph 1(a)(i)(2) of the order entered in the above captioned case on March 19, 1992 (D.I. 49) is amended to read as follows:

"(2) TECH–TEX fabric or rainsuit is waterproof, guaranteed waterproof, or total water repellent;"
No other amendment is made.

2. Paragraphs 1(a)(iii) and 1(a)(iv) are not amended or clarified.

3. The motion for a temporary stay is denied.

REASONS:

1. The amendment is necessary to conform the order to the accompanying opinion. Further amendment is unwarranted.

2. Parts (iii) and (iv) of 1(a) on page 2 are limited to the products and issues discussed in the opinion and, therefore, the sections are not vague nor do they impose uncertain behavioral guidelines. Moreover, the record indicates that the improper claims are likely to occur in the future and these sections are necessary to prevent the continuation of these claims.

3. A stay is not necessary to promote judicial economy or the fair administration of justice and the defendant offers no evidence as to prejudice.